Filed 10/29/13  In re Autumn I. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re AUTUMN I., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, | F065578 |
| Plaintiff and Respondent, | (Super. Ct. No. 11JD0078) |
| v. | **OPINION** |
| ANGELINA I., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kings County.  George L. Orndoff, Judge.

Linda J. Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Colleen Carlson, County Counsel, Bryan Walters and Carrie Wooley, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Angelina I. is the paternal grandmother and legal guardian of Autumn I. (born March 2004). Angelina appeals from the juvenile court's jurisdictional and dispositional orders declaring Autumn a dependent of the court and removing Autumn from her custody. Angelina contends: (1) the juvenile court violated her statutory right to counsel and the error was prejudicial; (2) the juvenile court abused its discretion when it granted de facto parent status to the maternal grandfather and stepgrandmother; (3) the juvenile court erred in allowing the de facto parents access to the juvenile court records; and (4) the juvenile court abused its discretion by accepting a social worker as an expert on false memory syndrome and the error was prejudicial. We reverse the juvenile court's order allowing the de facto parents access to juvenile court records. In all other respects, the jurisdictional and dispositional orders are affirmed.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### A.      *Initiation of Dependency Proceedings*

On November 23, 2011, the Kings County Human Services Agency (agency) received a referral expressing concern that Angelina had mental health problems which were emotionally harming Autumn, who was then seven years old. The agency substantiated the referral for general neglect and filed a dependency petition on Autumn's behalf. Autumn was not detained but remained in Angelina's custody until the dispositional hearing in July 2012.

On March 21, 2012, the agency filed a second amended petition, which alleged Autumn was at substantial risk of suffering serious emotional damage (Welf. & Inst. Code, § 300, subd. (c)),[1] as a result of being included in Angelina's delusions, namely, that: (1) Autumn was sexually abused by her maternal stepgrandfather; (2) Autumn sexually abused her younger half sister; and (3) Autumn suffered serious and/or chronic

---

[1]      Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

health problems.  The petition further alleged that, as a result of Angelina's delusions, Autumn had false memory syndrome and had been subjected to unnecessary and/or invasive medical procedures, including but not limited to a sexual assault response team (SART) examination, further placing her at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal, or untoward aggression toward self or others.

## B.    *Contested Jurisdictional Hearing*

### 1.    *Documentary evidence*

The jurisdiction/disposition report and addendum reports reflect that Angelina's allegations of sexual abuse against Autumn's maternal stepgrandfather, Steve P., arose when Autumn was around three years old.  At the time, the agency and local police department investigated the allegations and Autumn underwent a SART examination.  At the conclusion of their investigations, the agency and police found no evidence Steve engaged in any type of sexual abuse.  They also agreed that Autumn had not in fact been sexually abused.

Despite the contrary findings of the agency and police department, Angelina has consistently maintained that Steve sexually abused Autumn and has continued to repeat this as fact to Autumn and others.  In the agency's opinion, Angelina's behavior has caused Autumn to suffer false memory syndrome, "a condition in which a person's identity and interpersonal relationships are centered around a traumatic experience which is objectively false but in which the person strongly believes."

Autumn also appears to hold the false belief that she sexually abused her two-year-old half sister, Riley M.  The agency investigated allegations of such abuse in the summer of 2011 and determined the allegations to be unfounded.  During the investigation, Autumn disclosed a single incident in which she and Riley "touched each other's bottoms while bathing."  Although the agency considered this age-appropriate

behavior, Angelina has continued to insist that Autumn's behavior constituted an act of sexual abuse.

In addition, Angelina had continued to subject Autumn to "the belief that she cannot do normal childhood activities because she has scarred lungs and a weak heart due to her mother's neglect and drug use." Although Autumn's mother, Fallon M., does have a history of drug use, there is no medical evidence to support Angelina's claim that it caused Autumn to suffer these health conditions. However, when medical personnel have informed Angelina that Autumn is fine, Angelina has continued to express "a litany of concerns" about Fallon in Autumn's presence.

In February 2012, the agency had David Sine, M.D., review Autumn's medical records. Dr. Sine concluded that Autumn had "mild asthma at best." Dr. Sine also noted Autumn had a higher "number of medical encounters" than would be expected for a healthy child her age. But the evidence was insufficient to find "medical neglect or fictitious syndrome by proxy" on Angelina's part.

On March 20, 2012, the agency received a lengthy handwritten declaration from Angelina, attacking the agency, individual social workers, and law enforcement for their handling of her sexual abuse allegations against Steve. Angelina continued to insist Autumn was sexually abused and that the SART examination failed to detect this. Angelina also claimed the dependency allegations were essentially a maneuver aimed at discrediting her. The agency concluded Angelina's declaration was indicative of her "mental instability and her continued … emotional abuse on Autumn."

On March 22, 2012, the agency interviewed Autumn's mother, Fallon. Fallon reported that when she recently questioned Autumn, Autumn denied that she was sexually abused and claimed she told child protective services (CPS) she had been touched badly because Angelina told her to. Fallon reported that Autumn told her the same thing when the allegations against Steve first surfaced. When Fallon confronted Angelina at that time, Angelina said Steve also abused Fallon when she was a child, but

4.

Fallon just could not remember it. Fallon reported knowing Steve all her life and said he never touched her inappropriately. Fallon further reported that when she questioned Autumn, Autumn denied touching Riley inappropriately. Thus, Fallon believed that Autumn actually knew she was not a victim or perpetrator of sexual abuse despite her statements to CPS.

On April 12, 2012, the agency learned that Fallon had recently received a letter from Angelina alleging Autumn had begun to recall past acts of physical and emotional abuse by Fallon and Autumn's maternal grandmother, Tonya O. (Steve P.'s wife). Angelina attached a copy of the letter to a declaration she filed with the court on April 16, 2012. According to Angelina's letter, Autumn told her that she recalled Fallon and Tonya trying to kill her in various ways, including by putting "poop" and "pee" in her food. Autumn also recalled that Fallon called her a "nigger" and said she had wanted "blonde kids." Autumn further recalled that Fallon cut her palms, legs, and forearms with a pocketknife while Tonya placed a "death chant" on her.

After assessing Angelina's letter, the agency determined the allegations met the criteria for a CPS referral. Social service practitioner Delia Acosta-Perez was assigned to investigate the referral and conducted a forensic interview of Autumn on April 18, 2012. During the interview, Autumn indicated she was between the ages of three and five when the alleged incidents of abuse occurred. Autumn made statements confirming some but not all of the allegations in Angelina's letter.

Acosta-Perez concluded she "[could] not find the allegation of general neglect to be true," observing "it was clearly apparent that the child was most likely coached by [Angelina]." Acosta-Perez noted that when the interview ended, Autumn ran to Angelina, who was in another room, and whispered in her ear, "I told her." Angelina responded by hugging her and saying, "Good, I'm glad you told her." It appeared to Acosta-Perez that Angelina was rewarding Autumn "for making the disclosures as if it was deliberately planned."

Moreover, Autumn told Acosta-Perez she remembered all of the incidents of abuse three days prior to the April 18, 2012 interview, but Angelina's letter detailing the incidents was dated April 5, 2012.

### 2. *Testimony of social worker Sai Mouanoutoua*

The contested jurisdictional hearing was conducted over four days between April 19 and May 17, 2012. The agency's witnesses testified about the foregoing incidents and other information contained in reports received by the juvenile court. We do not repeat testimony that is duplicative of information already set forth above or not directly pertinent to the issues on appeal.

Sai Mouanoutoua, the social worker assigned to investigate the referral underlying the current dependency proceedings, described in her testimony how Angelina embellished conditions and events during the course of the agency's involvement. For example, when Angelina interacted with professionals, Angelina openly explained in front of Autumn that Autumn was a victim of sexual abuse and a perpetrator of incest. Angelina described Autumn's touching of her half sister's bottom as "rape" to social worker Monica Chancey and to the maternal stepgrandmother, Francine M.[2]

During Autumn's therapy sessions, Angelina told the therapist that Autumn had been sexually abused. Autumn, however, never mentioned this to the therapist. The only mention of sexual abuse came from Angelina. Angelina also told the therapist that Autumn had molested another child and committed incest. And when the allegations against Steve first surfaced, Angelina stated that Autumn had herpes on her vaginal area and therefore had been raped. Angelina continued to insist Autumn had herpes, even after the doctor determined it was only a bacterial infection.

In Mouanoutoua's opinion, Angelina's tendency to embellish presented a risk of harm to Autumn. One such risk was that it had caused Autumn to suffer false memory

---

[2] Angelina testified she never told Francine or Chancey that Autumn "raped" Riley.

syndrome, which is "when an individual believes that an event occurred objectively in their life; however, there has been no factual foundation [on which] to base their belief." False memory syndrome is harmful because it causes the child to isolate herself, which is something Autumn had already started doing, and affects the "functionality" of the child's relationships.

In assessing whether a child has false memory syndrome, Mouanoutoua testified she would start by assessing whether the child exhibited typical symptoms of child sexual abuse. Such symptoms include low self-esteem, poor appetite, withdrawal, depression, and sexual behavior not typical of the child's age. When Autumn was interviewed, she never displayed any of these symptoms.

Another circumstance that was consistent with false memory syndrome was that Autumn's version of the alleged molestation evolved over time. When Autumn was seven years old, she told an investigator that she had been molested by Steve. When the investigator asked her how she knew that had happened, she answered, "Because my grandma said." Then, when Autumn was eight years old, she explained to Mouanoutoua she knew about the molestation because she had been there. Autumn also said she knew it was bad and that she escaped it by jumping a fence and hiding under a bed.

It is not typical for an eight-year-old child to be able to recall an experience that occurred when she was two or three years old, which was Autumn's age when the sexual abuse allegedly occurred. Additionally, a typical child that age does not have the capacity to recognize whether a touching is bad or not, or have the sense that it is something that needs to be escaped from. Nor would a child that age likely have the physical capacity to jump over a fence.

Autumn was now at an age that she was susceptible to information. And because she had been informed that she was the victim of sexual abuse, she was creating facts to fill in her factual gaps. Over the years, Autumn's understanding of events and her statements describing them had progressed as she filled in the facts. In Mouanoutoua's

7.

opinion, Angelina was planting false memories into Autumn's mind and Autumn was creating a factual background for them. She believed Autumn had never been sexually abused but instead was exhibiting signs of false memory syndrome.

Mouanoutoua also believed that Angelina's embellishment created a risk of harm to Autumn in that she was constantly sick and missing school, thereby losing the opportunity to socialize. Angelina also insisted that Autumn not play with a particular child at school, even though Autumn sought out that child for play.

Mouanoutoua had visited Angelina's home four or five times since October 2011, when she became Autumn's social worker. Each time, the house was clean, neat, and appropriate. Autumn seemed happy and at ease. She seemed comfortable in the home and maintained close proximity to Angelina. However, Mouanoutoua sometimes thought Angelina had coached Autumn. For example, when Autumn invited Mouanoutoua into her playroom, she twirled around with her arms spread open and said, "Look how many toys I have. My grandmother loves me so much. I have so many toys." Mouanoutoua believed that Autumn understood the agency's procedure and what to say and how to behave.

### 3.  *Testimony of police officer John Bidegaray*

John Bidegaray is a police officer who investigated Angelina's original allegations of sexual abuse against Steve. In June 2007, Bidegaray was dispatched to the hospital in response to a call by Angelina reporting she had found blood in Autumn's urine. He arranged for a SART examination. No evidence of sexual abuse was found.

A few weeks later, Bidegaray was dispatched to the agency's office because Angelina was again reporting that she believed Steve might have molested Autumn. The officer spoke to Autumn for about 30 minutes, and she did not even hint at being inappropriately touched or molested by Steve. In fact, she said she liked both him and Tonya O. Autumn was in good spirits and said she had no problems. Bidegaray then spoke to Angelina, who explained that Autumn never mentioned being touched

8.

inappropriately, but came home from Steve's home smelling like "man sweat," so Angelina thought Steve might have done something inappropriate. After speaking to Autumn, Angelina, and Steve, Bidegaray found no evidence that a crime had occurred and concluded Angelina's allegation was unfounded.

Over the years, Bidegaray had other contacts with Angelina's family, usually regarding Angelina or her son, Kevin I. (Autumn's father). Angelina would call and report that her son was suicidal, but when the officer would contact him, he would explain that Angelina had mental problems and overreacted to everything.

### 4. *Testimony of social worker Monica Chancey*

In June 2011, when Autumn was seven years old and her half sister, Riley, was about three years old, Lupe M., Riley's paternal grandmother and guardian, told Angelina that Autumn had inappropriately touched Riley. Angelina and Lupe went to the agency with the children. Monica Chancey brought them into her office and told them she was the assigned social worker but it was not the agency's policy to interview Autumn at that point. Chancey explained that they tried to interview children in a manner conducive to protecting the integrity of any disclosures they made. The more people to whom the children disclosed their story, the more the disclosures would change.

But after Chancey's explanation, Angelina continued to talk about the allegations and the past history of sexual abuse right in front of Autumn. Autumn sat with her head bowed, looking down. Chancey was very uncomfortable and wanted to stop the ongoing dialogue in Autumn's presence. Chancey held up her hand and said, "You know, we need to stop this because this is not appropriate." She said several times, "[Angelina], it is not appropriate for you to be making these kinds of comments in front of [Autumn]." Angelina did not seem able to understand why that was not appropriate.

Chancey took Autumn into another room to speak to her. Chancey asked Autumn, "Do you know why you're here?" Autumn said she knew she was there to talk about Steve P. (identifying him by both his first and last name). Chancey asked, "Well, why

9.

am I going to interview you about Steve [P.]?" Autumn said it was because he had sexually abused her. Chancey asked her how she knew that, and she answered, "[b]ecause my grandma told me." Autumn had no recollection of any abuse other than what Angelina had told her.

Chancey then returned to speak to Angelina. She told Angelina that Autumn had not disclosed any abuse and that she would follow up with them later that week. Chancey told her if Autumn was a victim of sexual abuse, it was critically important that Autumn's disclosure remain intact and its integrity maintained so that the disclosure came from Autumn not from information from her grandmother because that would not hold up in court. Angelina became very upset and told Chancey that she had an attorney and he told her the agency had failed to follow their legal mandate and they were all going to be in trouble for allowing Autumn to be sexually abused. Angelina said she went to great expense to hire Ronald Calhoun as her attorney.[3] Chancey looked at the family's referrals and told Angelina the allegations had been investigated and determined to be unfounded because no evidence supported them.

Angelina became more and more agitated and upset. She told Chancey that Autumn's maternal grandfather and stepgrandmother, Frank and Francine M., exposed Autumn to "profane movies." As they continued to speak, Angelina got very upset, so she stood up, walked out, slammed the door, and left. After an awkward silence, Lupe, who remained seated in the room, apologized for Angelina's behavior, explaining that she "means well but … tends to become agitated and highly excited … [and] in her love for Autumn she tends to become somewhat overly demonstrative." Lupe admitted she

---

[3] Angelina testified that the first time she went to Mr. Calhoun's office was on December 7, 2011, when she asked him to be an advocate for Autumn, and that when she met Chancey in June 2011, she had not yet been in contact with his office. As discussed in more detail below in part I of the Discussion, Mr. Calhoun acted as Autumn's attorney during the dependency proceedings and Angelina represented herself.

did not always do things the way Angelina did them, but it was better to have Angelina on her side. She was concerned that Angelina continually filed things in family court, and she was going along with it because she did not want Angelina to disrupt her own guardianship over Riley.

Chancey interviewed Autumn two more times. Autumn stated that Steve P. had molested her. Chancey asked her what she meant and how she knew this. Autumn consistently replied that she knew these things because her grandmother had told her. She never was able to describe any touching or other conduct that would constitute molestation. She disclosed not what she recalled but what Angelina had told her.

On another occasion, Angelina informed Chancey that she (Angelina) had been a victim of sexual abuse. At one point, she called Chancey and angrily complained about the maternal family and reiterated her allegations of sexual abuse. She asked Chancey pointblank if she had ever been sexually abused. Chancey advised her that this was a completely inappropriate question to ask anyone, much less the investigating social worker, because it was a very private and personal subject. Angelina responded that this was the reason Chancey did not recognize that Autumn was a victim of sexual abuse and that she, on the other hand, could discern this because of her own history. Without that history, a person could not recognize it.

According to Chancey, these incidents demonstrated Angelina's inability to recognize appropriate boundaries and refrain from inappropriate behavior. Angelina also did not understand it was inappropriate to make comments in front of Autumn, despite Chancey's explanations and warnings.

On one occasion, Angelina witnessed a custody exchange of the two children (Autumn and Riley) from Angelina and Lupe to Frank and Francine. Lupe was interacting with Frank and Francine, but Angelina stood off to the side with her arms crossed over her chest. The two children got into the car. As the car started to drive away, Angelina followed it, clutching her chest with her hand and calling after Autumn,

11.

as if she would never see her again, even though she was going to see her in two days. It was overly demonstrative behavior that was in keeping with Angelina's attitudes.

### 5. Testimony of Autumn's maternal stepgrandmother, Francine M.

In her testimony, Francine indicated she and her husband Frank had an acrimonious relationship with Angelina, with a history of accusations. Frank and Francine were granted visitation of Autumn in October 2010 (around the time Angelina became Autumn's guardian). After that, Angelina sent them about 32 text messages, one of which stated that she was going to take Autumn to San Luis Obispo. Autumn had already missed many of her scheduled visits with them, so they became worried that Angelina was going to take Autumn out of the county. In February 2011, Frank and Francine petitioned for and were granted more extensive visitation to include the second and fourth weekend of every month. But on June 8, 2011, four days before their next scheduled visit, Angelina left a voice message in a panicked state, saying that her mother was ill and she had to leave for San Luis Obispo. Frank and Francine attempted to contact Angelina but got only a message. Autumn then missed the visit. Frank and Francine feared Angelina had taken Autumn permanently, so they contacted the police and filed a report. They did not request that an "Amber Alert" be issued. They continued trying to contact Angelina for their scheduled telephone calls with Autumn. After getting no response, they contacted the police a second time. Angelina ultimately returned and Autumn visited with Frank and Francine.

During some of those more recent visits during the year prior to the hearing, Francine noticed that Autumn had begun to wet her pants. At first, Francine thought Autumn was merely distracted or forgetful, so Francine encouraged her to stop playing and use the bathroom. But then the wetting started to occur at night too. Shortly thereafter, Frank and Francine received a two-page letter from Angelina stating that Autumn had come home and reported that Francine had not allowed her to go to the bathroom, which was not true. The letter also stated that Angelina knew Autumn had a

12.

bladder problem and she was having problems in Angelina's home as well. Angelina explained that Autumn had small kidneys and a small bladder. The wetting was still occurring with the same severity at the time of the jurisdictional hearing.

When Autumn came to visit Frank and Francine, she came with four or five different asthma medications, although she never had asthma attacks during her visits. Francine did not know if Autumn actually had asthma.

### 6. *Testimony of Riley's paternal grandmother and guardian, Lupe M.*

Lupe testified on Angelina's behalf that she and Angelina went to the agency not because of Angelina, but because *she* had concerns, explaining Riley's perineum was always irritated when she returned from visiting Frank and Francine. After a bath, Riley yelled, "No. No. No. No, don't touch me. Don't touch me there. Don't smell my butt." Riley said, "[Autumn] smells my butt and she touches me." Lupe suspected that the two children were engaging in inappropriate touching when they went to visit Frank and Francine. Lupe called Angelina and they went to the agency. They were called back to see Chancey, and when she opened the door, she seemed surprised to see Angelina there. She said, "Did you know that there was an Amber Alert out on you?" After Angelina stormed out of the office and slammed the door, Lupe was stunned by what was happening. Chancey told her, "By golly if it's the last thing I do I'm taking that child from her."[4]

Lupe agreed that she did not want trouble with Angelina so she generally went along with whatever she said.

### 7. *The juvenile court's ruling*

At the conclusion of the jurisdictional hearing, the juvenile court found the allegations of the second amended petition to be true and found that Autumn came within section 300, subdivision (c). The court then expressed a preference for conducting the

---

**4** Chancey denied making these statements.

13.

dispositional hearing in a few weeks rather than the same day as the jurisdictional hearing, explaining: "I think since it was an emotional case and I'm sure everyone has had an emotional reaction to the decision … I think it's probably better we all calm down for a couple weeks and put our best thinking … into what's in the best interest of Autumn."

## C.    *Contested Dispositional Hearing*

### 1.    *Documentary evidence*

In an addendum report filed on June 7, 2012, social worker Mouanoutoua reported that, while the agency's original disposition report recommended family maintenance services for Angelina, in light of new and developing information, the agency now recommended family reunification services be provided to Angelina and Fallon.

In Mouanoutoua's opinion, Autumn had suffered or was at substantial risk of suffering severe emotional harm should she remain in Angelina's care, noting Autumn was "in an environment where she is surrounded with misinformation, humiliation, corruption and isolation." In support of her opinion, Mouanoutoua set forth a number of examples which she also testified to at the dispositional hearing and are described in more detail in the summary of her testimony below. She also cited to a number of academic articles in rendering her opinion.

Regarding her opinion that Autumn was suffering emotional harm, Mouanoutoua acknowledged that "[a] few may argue that despite Autumn's emotionally distressing environment, Autumn is doing well as evidenced by her good grades and lack of behavioral problems." The same individuals "may also argue that Autumn self reports that she is happy and well in [Angelina's] care." However, because young children have difficulty reporting their internal states, professionals have to rely on observations. Despite Autumn's good grades and positive self reports, she has exhibited a number of concerning behaviors resulting from Angelina's emotional abuse.

Although Autumn reported feeling "good," her therapist noted that Autumn's statements were contradicted by her behaviors. Autumn often complained of stomach pain and headaches, which caused her to frequently miss school. These physical symptoms appeared to reflect "somatization of her depression and anxiety." Mouanoutoua explained: "Somatic symptoms occur when individuals relate their moods and stress to physical pain, such as headaches or stomach pains (American Psychiatric Association, 2000). Children often experience somatic symptoms because they have no understanding of mental health concepts." Therefore, while Autumn might report that she feels good and happy, she somatizes her anxiety and depression through experiences of physical pain.

Mouanoutoua also reported speaking to Angelina about Autumn's wetting accidents. Angelina acknowledged that Autumn would have accidents one or two times a month. She did not feel Autumn had a problem with enuresis and said the accidents were due to Autumn playing and forgetting to go to the bathroom. Angelina felt the wetting accidents were "normal" and said she would have taken Autumn to an urologist if she was having either frequent or irregular accidents. Angelina expressed the belief that Francine "committed perjury" at the jurisdictional hearing. Angelina explained that when she asked Autumn about the statements Francine made in court, Autumn denied having wetting accidents in Frank and Francine's residence and said it was Riley who was having the accidents.

Mouanoutoua reminded Angelina she was not to discuss the dependency proceedings with Autumn. Angelina responded that Mouanoutoua was "also guilty" because the social worker had questioned Autumn about urination issues. Mouanoutoua attempted to explain that she questioned Autumn in a nonsuggestive way, while Angelina told Autumn about the information provided by Francine. Angelina interjected that she questioned Autumn in a calm manner and did not hurt Autumn in any way. Angelina then turned to Mr. Calhoun, who was present at the meeting, and asked, "You would tell

15.

me if I violated any laws, right?" Mr. Calhoun responded by nodding his head. Mouanoutoua reiterated that Angelina could not discuss the case with Autumn, and reminded her to be conscientious about how she questioned Autumn. Angelina said she understood and said she had not discussed the case with Autumn.

On May 21, 2012, Mouanoutoua spoke with Dr. Mary Sanders, a psychologist and professor at the Stanford School of Medicine, who reviewed the records in this case and provided her expert opinion. Mouanoutoua reported that Dr. Sanders told her there were "some indicator[s] of delusional process and exaggerated statements by [Angelina]" and "also indicators that [Angelina] falsifies information." But Angelina would have to be formally evaluated to determine whether she had "Munchausen by Proxy, delusional/psychotic personality or a factious syndrome." Mouanoutoua noted that Dr. Sanders emphasized the need for Angelina to be evaluated.

When asked whether she felt Autumn was in danger and should be removed from Angelina's home, Dr. Sanders stated "in some cases, short removal would be beneficial because it cuts through denial between the care provider and the child." Dr. Sanders felt it was important to place Autumn in a loving and nurturing home to prevent further damage. Dr. Sanders did not know whether Autumn suffered from false memory syndrome or was just lying and manipulating because it was her coping mechanism to get along with Angelina. Therefore, she recommended that Autumn also undergo a formal evaluation by an experienced psychologist.

In an addendum report filed June 15, 2012, Mouanoutoua reported that Frank made an unannounced visit to her office on June 7, 2012. Frank said he received a voicemail from Angelina stating she was taking Autumn out of school because Autumn "prematurely started her period." Angelina said Autumn's breasts were "budding" and she was going to have Autumn go through a "battery of tests." Frank expressed concern that Angelina was subjecting Autumn to unnecessary tests again. He also stated that when he saw Autumn the previous weekend, he did not notice "budding breasts."

16.

At Frank's request, Mouanoutoua listened to Angelina's voicemail. She heard Angelina say that Autumn started her period at school and had a doctor's appointment the next morning at 9:00 a.m. Angelina said Autumn was "cramping," had a "sore stomach," and was in "a lot of pain." Angelina stated that doctors would conduct a "battery of tests" to see if they could stop what Autumn was going through. Angelina also said Autumn would not be visiting Frank's family that weekend.

Frank and Francine later confirmed that Autumn did attend her scheduled visit on June 8, 2012, during which time they did not observe any signs that Autumn had started her menstrual period. Autumn was playful and active during the visit. According to Francine, Angelina told them she took Autumn to the doctor prior to the visitation exchange and that Autumn only had a rash due to taking too many bubble baths. Frank interjected that Angelina instructed them not to allow Autumn to soak in water and gave them Neosporin to help with the rash. Subsequently, Mouanoutoua obtained a copy of the doctor's notes confirming that Autumn had been diagnosed only with a rash and the doctor had recommended Neosporin for treatment. The doctor's notes further reflected that Autumn's urinanalysis returned normal and no blood was noted.

On June 8, 2012. Mouanoutoua received a fax from Francine stating she had received "disturbing" text messages from Angelina. The original text messages were later retrieved from Francine's phone. Mouanoutoua noted that she counted over 40 messages sent from Angelina to Francine, and four messages sent from Francine to Angelina. The messages began with Angelina stating that Autumn had prematurely started her period and would not be able to visit. Angelina then "[went] on to reference Mr. Calhoun and law suits" when Francine expressed determination that Autumn attend her scheduled visit. Towards the end of Angelina's messages, she changed the topic and alleged that Autumn witnessed Steve molest other children and that Steve killed a little boy and "cut [the boy's] peepe." Angelina further stated that Autumn loved Jesus and

17.

would not lie for Steve anymore, that Autumn wanted Steve in prison so he would not hurt kids anymore, and that Steve was dangerous and a murderer.

On June 21, 2012, Frank came to Mouanoutoua's office and reported that on June 18, 2012, he received text messages from Angelina "ranting" and claiming he was using scare tactics on Autumn. Frank did not know what prompted Angelina to send this new series of text messages. In her text messages to Frank, Angelina repeatedly used the acronym "P.O.W." in reference to his alleged tactics to break Autumn down emotionally. She also accused Frank, Francine, CPS, and social worker Chancey of being "[l]iars." Angelina further charged that if anyone was insane it was Frank and Francine, and that Frank was the one who embellished. Angelina also accused Frank of being back on heroin, and claimed she knew someone who saw him shooting up in his car.

### 2. Testimony of social worker Mouanoutoua

The dispositional hearing took place on July 12 and 19, 2012. Mouanoutoua recommended removal of Autumn from Angelina's home because she believed Autumn was suffering severe emotional harm and the only way to prevent further harm was to remove her. Mouanoutoua believed Autumn was suffering severe anxiety, emotional withdrawal, and aggression toward others.

Autumn exhibited mood swings, indicating she was suffering severe anxiety. For example, when Mouanoutoua first made contact with Autumn at the school office to interview her in December 2011, Autumn started crying when she saw Mouanoutoua. Autumn walked to the front desk and grabbed the telephone. A school employee asked Autumn what she was doing and she said she needed to call someone. The employee prevented her from making the call and told her she needed to talk to Mouanoutoua before making a call. Autumn pulled out a business card and told Mouanoutoua it was Mr. Calhoun, her attorney. She said she could not speak to Mouanoutoua unless Mouanoutoua got permission from Mr. Calhoun. Autumn hunched and backed away, then started crying loudly and made a scene in the office. Mouanoutoua believed

18.

Autumn had been instructed not to speak with her. The school personnel could not console Autumn and she did not stop crying until Mouanoutoua assured her she did not have to speak with her and she was not going to get in trouble. At that point, Autumn calmed down and started telling Mouanoutoua about her guinea pig.

On another occasion when Mouanoutoua visited Autumn at home, Autumn greeted her with a smile and asked if Mouanoutoua would like to see her playroom. But when Mr. Calhoun arrived to discuss the case, Autumn's demeanor toward Mouanoutoua changed. Autumn pointed at Mouanoutoua, called her mean, and told her she did not want to talk to her.

School officials told Mouanoutoua that Autumn would behave badly when she learned that Angelina would be informed of something that happened at school. She would cry and complain because she was afraid of how Angelina would react.

Autumn also manifested anxiety outside of the school setting. She regressed back to chronic thumb sucking and began showing symptoms of enuresis. Mouanoutoua explained that by the age of five, children are less likely to have wetting accidents because developmentally they are at a point where they can control their bodily impulses. Autumn's maternal grandparents reported that they just started noticing the wetting accidents in May 2011. School officials also reported that Autumn had two wetting accidents at school between August and December 2011.

In Mouanoutoua's opinion, as Autumn was pulled between Angelina and her maternal grandfather and stepgrandmother, Autumn developed anxiety because she was required to make statements that pleased each side, creating an emotional conflict. People had also talked to her about the facts of the case, exacerbating her emotional harm and adding to her stress.

In addition to anxiety, Autumn exhibited emotional withdrawal, evidenced by an inconsistency between her behavior and her statements. Autumn had not disclosed any sexual abuse to her therapist, but Angelina projected her own experience as a victim of

19.

sexual abuse onto Autumn, even pressuring her to "tell the truth" when she did not disclose anything. When this occurred, Autumn became mute and coy, regressing herself. The therapist later asked Autumn about this incident and she denied being affected by it. She would often report that she was happy and great. She avoided difficult discussions and personal questions. In general, her behavior did not reflect her emotions. She always reported being fine, happy, and great, regardless of the situation. She did not deal with her emotions appropriately.

Autumn exhibited aggression toward others with blatant lying and stealing. She used these pathological methods as coping mechanisms to survive in her environment. She knew she would be found out, but she was unconcerned about the consequences. For example, she accused her half sister of being the one with a wetting problem, and she stole things from relatives.

Another reason removal was necessary was that Angelina had been resistant to the agency, consistently denying that anything the social workers said was true. She portrayed the agency as making everything up to go after her. Angelina had shown no interest in dealing with the issues in this case. The agency had attempted to engage Angelina in services to keep Autumn safely in the home, but Angelina was in denial. Although there was absolutely no evidence that Autumn was ever sexually abused, Angelina refused to consider the possibility that it had not happened. And since the hearings had begun, Angelina had reported that Autumn was now a victim of satanic rituals and death chants at her mother's hands. Autumn herself stated that her mother and maternal grandmother wanted to kill her, and they had cut her all over her body with a pocketknife. Physical examination, however, revealed no scars anywhere on her body. Angelina had also stated that Autumn witnessed the maternal stepgrandfather murder other children and cut off a boy's penis, and that Autumn had tried to help these children escape from the maternal stepgrandfather, who then buried the children in his backyard.

Mouanoutoua did not believe family maintenance was a reasonable means of protecting Autumn. No services could ameliorate the emotional harm to Autumn. Despite the lack of any evidence, Angelina was insisting to Autumn that she was a victim and a perpetrator of sexual abuse and a victim of satanic rituals. She was at risk for severe depression, which often leads to chronic drug use, school dropout, sexual behavior, and criminal behavior. She was already exhibiting pathological behaviors. She needed the opportunity to heal emotionally.

### 3. The Juvenile Court's Ruling

At the conclusion of the hearing, the juvenile court adopted the agency's recommendations, finding clear and convincing evidence that continuing Autumn in Angelina's home was contrary to Autumn's welfare. The court found Autumn was suffering severe emotional damage as indicated by extreme anxiety, depression, withdrawal, untoward aggressive behavior toward self and others, and there were no means by which her health could be protected without removing her from the physical custody of Angelina. The court ordered Autumn removed from Angelina's custody and placed under the agency's supervision and ordered the agency to determine a suitable placement for her. The court ordered reunification services and supervised visitation for both Angelina and Fallon.

### DISCUSSION

### I. Right to Counsel

Angelina contends that although she asserted her right to represent herself, she was deprived of her statutory right to counsel. The agency concedes the juvenile court failed to properly advise Angelina of her right to counsel at every hearing and failed to take an effective waiver of her right to counsel, but the agency maintains that the error was harmless. We agree with the agency and conclude Angelina has failed to demonstrate

21.

a reasonable probability the outcome of the proceedings would have been more favorable to her had she been represented by counsel.

### A. Background

At an arraignment hearing on January 5, 2012, Deputy County Counsel Bryan Walters questioned the propriety of Mr. Calhoun representing Autumn and objected to the appointment of counsel for Angelina. The issues raised by Mr. Walters are reflected in the following excerpts from the hearing:

> "MR. WALTERS: Well, your Honor, there's going to be an issue as to whether the person who is the alleged perpetrator is allowed to retain an attorney to represent the alleged victim in the case. And so [minor's advocate Pat] Belter is available. Mr. Calhoun is claiming he represents the minor, but I think that's something the Court needs to inquire into. [¶] … [¶]

> "Your Honor, before [counsel for Angelina is appointed], I would like to raise an objection. There's clearly a funding crisis in California and I somewhat question the propriety of the Court using court-appointed counsel to represent the guardian, who has paid money, apparently, to have Mr. Calhoun here to represent the minor. I do not think that is proper.

> "MR. CALHOUN: It's none of his business what my retainer is, your Honor. [¶] … [¶]

> "MR. WALTERS: And, your Honor, I do think it's the Court's business whether public funds are being used to appoint an attorney and I think I do have standing.

> "THE COURT: I certainly agree with you. [¶] … [¶]

> "Angelina [I.] is present and we have a question as to who's going to represent her interests.

> "And, [Angelina], have you hired an attorney to assist you with your case?

> "[ANGELINA]: I have contacted Ron Calhoun to represent her as an advocate.

22.

"THE COURT: As far as your interests are concerned, that's what I'm asking about. Not the child's, but yours.

"[ANGELINA]: No, not for me.

"THE COURT: And, Mr. Calhoun, where do you come into this as to who has retained you, if anyone, to represent whom?

"MR. CALHOUN: I represent Autumn.

"THE COURT: And has Autumn retained you?

"MR. CALHOUN: Yes. [¶] … [¶]

"THE COURT: Do you have a written representation agreement?

"MR. CALHOUN: No.

"THE COURT: I thought the current bar rules kind of required to get some kind of written [agreement]. [¶] … [¶]

"I have another issue I haven't resolved yet and that's the ability of a seven-year-old child to retain an attorney. And I have some real concerns about that. And, probably, I need to inquire of the child about where she got the money and that sort of thing. Because, obviously, I don't want Mr. Calhoun to be in a conflict of interest situation where one side is paying and another side is supposed to be represent[ed]. Their interests may not be the same thing. I don't want to do that to Mr. Calhoun. So I think I have to conduct some kind of inquiry about that. [¶] … [¶]

"MR. CALHOUN: To cut to the chase, your Honor, we all know who's paying for this. It's [Angelina]. Obviously, the child is not cutting me a check or anything like that.

"THE COURT: Then, the next logical question is if [Angelina] can afford to hire an attorney for the child, can she afford to hire an attorney for herself because she's apparently asking for a court-appointed attorney. If she has the ability, she should hire one herself, the attorney of her choice instead of the one I pick because she probably would get along better with the one she picks.

"MR. CALHOUN: I'm receiving the same amount that a court-appointed attorney would receive in this issue. And I'm not sure about her finances other than that.

"[ANGELINA]: I am currently on SSI and social security.

"THE COURT: And she understands that if I appoint an attorney for her, she's probably going to have to reimburse the Court for the cost of the court-appointed attorney, so she would be paying two attorneys.

"Do you understand that, ma'am?

"[ANGELINA]: I don't know the laws regarding that, but however—

"THE COURT: No free lunch.

"[ANGELINA]: I'm not expecting one.

"THE COURT: I think we need to do what we can today. And I need to have the child appear in court so I can do an inquiry into her best interests and wishes, as far as Mr. Calhoun being her attorney.… If I find he can represent the child because that's what the child wants and can afford him and that sort of thing, then, we have to worry about this potential conflict of interest. And this is for your benefit that, apparently, the guardian claimed at one point you represented her and it could create a conflict from your standpoint.

"MR. CALHOUN: That's according to the individual who interviewed her.

"THE COURT: I didn't say it was true. That's what I'm getting at.

"I think probably for today's purposes we can do part of the arraignment and we're going to have to continue it and have the child produced. I don't know any other way to do it."

At the beginning of the continued hearing on January 9, 2012, Mr. Calhoun stated: "I would like to point out that I am pro bono in representing [Autumn]. I never received a dime from [Angelina] so I think that possible conflict is no longer before the court." The juvenile court responded that it still had an obligation to determine if this was what Autumn wanted.

The juvenile court then spoke to Autumn in chambers. Afterwards, the court reported on their conversation and discussed Mr. Calhoun's ability to represent her as follows:

24.

"THE COURT: [W]e talked about Mr. Calhoun and she was very clear that she liked Mr. Calhoun, and she did talk to him in [his] office, and that it wasn't just the two of … them, and that that was her attorney. And I asked her what he was her attorney for, and she said this Court, and so I realize she is seven years old but that's the best answer I am going to get. And so as the Court is aware she is pretty sure that she wants Mr. Calhoun to be her lawyer.

"Mr. Calhoun has indicated that he is doing this pro bono, and I have inferred from that that he is not accepting any money from anyone else. And I just want to again … caution Mr. Calhoun that it's laden with a lot of professional pit falls, so I am not sure that you want to do that, but if you really want to do it .… [¶] … [¶]

"MR. WALTERS: If the Court is going to allow Mr. Calhoun to represent the minor in these proceedings then I would like to have an assurance he will be representing the best interest of the minor, and not telling the child not to answer questions or things that are going to shut down the investigation. I don't have any reason to know how he is going to do this, but that's what my client has been concerned about is that he views this essentially from the guardian's side of the case, and I think the child deserves neutral representation. If he'll assure the Court that he'll do this …, I'll accept his word.

"THE COURT: Mr. Calhoun, do you wish to comment on that?

"MR. CALHOUN: I'll assure the Court that I'll represent her interest to the best of my capacity.

"THE COURT: In any investigation a lot of what she has to say is really going to be important. So for her not to talk to the social worker is going to be—I don't know how it could be in her best interest. Now, as to what the questions are going to be and such, I have no idea about that, but the Child Protective Services is charged with the duty to protect the interest of the children and prevent them from being harmed through either abuse or neglect or things like that. And I have no idea what even may be the accusations … in this case. It's just I'm going to get the investigation done. Probably CPS needs to talk to Autumn, and see what she has to say.

"I am going to allow Mr. Calhoun to represent Autumn. And at this point I don't have anything that would disqualify him from representing her. That may change in the future, but for now I am going to allow him to be attorney for the child."

25.

The juvenile court then asked Angelina if she had been able to hire an attorney. This exchange followed:

"[ANGELINA]: Well, I made a decision, your Honor, that I would like to have an attorney appointed to represent me.

"THE COURT: And I made a decision that since you could, apparently the other day, afford to hire Mr. Calhoun for your granddaughter that you can afford to hire one for yourself.

"[ANGELINA]: I, at this time, because I am on SSI social security, I cannot afford it, and he is doing it pro bono at this time. I cannot afford it at this time.

"THE COURT: I'll need for you to fill out a financial form that talks about where your money comes from and where it goes.

"I have one here filed January 6th for Angelina [I.]

"[ANGELINA]: I fil[l]ed it out at the clerk's office. [¶] … [¶]

"THE COURT: … Somehow I'm missing something on the addition [on] the [form and the new] law here. I have monthly expenses that don't add up with [Angelina's] total the way I add them up. There's a couple of [hundred dollars] difference so…

"[Angelina], I am not sure how to deal with this because there is a new law about having people fill out financial disclosure forms, but I question your addition.

"[ANGELINA]: Well, I know. I question mine sometimes too.

"THE COURT: I am going to find that you can hire your own attorney. [¶] … [¶]

"Okay, I am going to need to put the matter over for [Angelina] to hire an attorney since she doesn't know any. There are a lot of attorneys in Kings County.

"[ANGELINA]: Yeah, but I also at this time have been taking care of Junior and I don't have that kind of money.

26.

"THE COURT:  You are going to have to try, ma'am, because your numbers don't add up.  Based on what you have on here you make $100 more than you thought you did."

At the next hearing on January 17, 2012, Angelina described to the juvenile court her unsuccessful attempts to hire an attorney.  The court then stated it would appoint an attorney to assist Angelina "with the understanding that at the end of the case, we're going to have some kind of a hearing for you to reimburse the county for the cost of the attorney."  Angelina responded that she would rather represent herself.  This exchange followed:

"THE COURT:  You certainly have a right to do that, if you wish.  I need to go through a bit of a ritual here.

"[ANGELINA]:  Yes.

"THE COURT:  And that is that all of the other parties in the case are going to be represented by attorneys and—

"[ANGELINA]:  Yes, I understand.

"THE COURT:  And they've all had lots of education and they've all had lots of experience in court in general and they've all had lots of experience in juvenile dependency matters.  And I don't know whether you've ever been involved in a trial or not.  I don't know if you've been involved in a dependency case before or not.  But you could be at a significant disadvantage because everybody else speaks a common language and you're the outsider, if that makes sense.

"[ANGELINA]:  Yes.

"THE COURT:  And because you're going to be representing yourself, the Court's not going to be able to give you a lot of leeway.  I'm going to have to hold you to the same standard I would hold Mr. Calhoun to.

"Do you understand that?

"[ANGELINA]:  Oh, yes.

"THE COURT:  Do you still wish to represent yourself?

27.

"[ANGELINA]:  Yes, sir.

"THE COURT:  Then I'm going to allow you to do it.  I'm going to allow her to be her own attorney for the hearing involving Autumn [I.]"

## B.    *Applicable Legal Principles*

By statute and court rule, an indigent parent has a right to appointed counsel in dependency proceedings where out-of-home placement is an issue.  (§ 317, subd. (b); Cal. Rules of Court, rule 5.534(h)(1)(B).)[5]

Section 317 provides in pertinent part:

"(a) (1) When it appears to the court that a parent or guardian of the child desires counsel but is presently financially unable to afford and cannot for that reason employ counsel, the court *may* appoint counsel as provided in this section.  [¶] … [¶]

"(b) When it appears to the court that a parent or guardian of the child is presently financially unable to afford and cannot for that reason employ counsel, and *the child has been placed in out-of-home care, or the petitioning agency is recommending that the child be placed in out-of-home care*, the court *shall* appoint counsel for the parent or guardian, unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section."  (Italics added.)

Rule 5.534(g) provides:  "At each hearing the court must advise [a] self represented child, parent, or guardian of the right to be represented by counsel and, if applicable, of the right to have counsel appointed, subject to a claim by the court or the county for reimbursement as provided by law."

On appeal, the parent must show a violation of the statute and establish that the claimed error was prejudicial, that is, that it was reasonably probable that a result more favorable to the parent would have been reached without the error.  (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667-1678; *In re Ronald R.* (1995) 37 Cal.App.4th 1186, 1195.)

---

[5]    Further references to rules are to the California Rules of Court.

*C.     Analysis*

Angelina claims that in rejecting her request for appointed counsel at the hearing on January 9, 2012, the juvenile court erred in finding she was able to afford counsel because her primary source of income was SSI payments, which may not be considered for the purpose of determining whether a person has the ability to pay legal fees in a dependency case. She further contends that her subsequent waiver of counsel at the January 17, 2012 hearing was not intelligent and knowing, in part, because the record indicates she waived counsel solely based on the court's representation she would be required to reimburse the county for the cost based on its erroneous finding that she was able to afford an attorney.

However, at the time of the January 9, 2012 hearing, Autumn had not been placed in out-of-home care and the agency was not yet recommending out-of-home placement. Therefore, Angelina's request for appointed counsel came within section 317, subdivision (a). Thus, in her reply brief, Angelina acknowledges "the appointment of counsel was within the court's discretion until such time as the agency recommended removal of Autumn from Angelina's custody" and did not become mandatory until June 2012, when the agency changed its recommendation from granting Angelina family maintenance services to removing Autumn from her custody. Nonetheless, Angelina asserts the court abused its discretion in denying her initial request for appointed counsel "because Angelina was at risk of losing custody of Autumn and the issues are complex."

We cannot agree that the juvenile court abused its discretion in denying Angelina's initial request for appointed counsel. Angelina was not faced with losing custody of Autumn at this early stage of the proceedings, and it was not yet apparent how complex the issues might become. The court was understandably skeptical of Angelina's assertions that she was unable to pay for counsel when four days earlier, at the January 5, 2012 hearing, she stated she had contacted Mr. Calhoun to represent Autumn and Mr. Calhoun candidly informed the court that Angelina, not Autumn, was paying for his

29.

services and that he was receiving the same amount a court-appointed attorney would receive. Although Mr. Calhoun subsequently stated that he never received any money from the mother (presumably referring to Angelina), his comments to the court suggest he declined payment, not because Angelina could not afford to pay him, but to avoid the potential conflict of interest issue raised by county counsel at the previous hearing. In light of Angelina's apparent willingness to pay Mr. Calhoun up to the time of the January 5, 2012 hearing, the court could reasonably question the credibility of her claim that she was unable to afford an attorney, as well as her financial declaration claiming only limited income from sources such as SSI and no other assets, including a bank account.

However, the agency concedes and we agree the record shows the juvenile court failed to advise Angelina of her right to counsel at each hearing as required by rule 5.534(g), and the court did not obtain an intelligent and knowing waiver of counsel once it became mandatory to appoint counsel under section 317, subdivision (b). The question then becomes whether Angelina has met her burden of establishing the court's errors were prejudicial. We conclude she has not.

One of Angelina's primary contentions on appeal is that the juvenile court erred in permitting social worker Mouanoutoua to testify as an expert on false memory syndrome. For reasons discussed below in part IV, even assuming the court erred in admitting Mouanoutoua's testimony on the subject, it is not reasonably probable Angelina would have obtained a more favorable result if the testimony had been excluded. For this reason, we reject her claim that she was prejudiced by the court's failure to appoint counsel for her on the ground counsel would likely have obtained a ruling excluding Mouanoutoua's testimony or called an expert witness to refute her opinion that Autumn suffered from false memory syndrome.

Another reason Angelina has failed to demonstrate prejudice on this ground is that Autumn's counsel, Mr. Calhoun, sought to exclude Mouanoutoua's testimony for the

30.

same reasons Angelina now asserts appointed counsel would likely have presented on her behalf.[6]  Specifically, Angelina argues that an attorney "experienced in the field of child dependency likely would have objected more vociferously to Mouanoutoua's testimony as an expert witness *based on a syndrome that is not accepted in California*" and objected to the social worker's qualification as an expert under Evidence Code section 720.  (Italics added.)  While not specifically invoking the Evidence Code in objecting to the admission of Mouanoutoua's testimony, Mr. Calhoun did specifically challenge her qualification to testify as an expert on false memory syndrome and stated, "I don't see her being an expert in false memory syndrome *when it's not even accepted in the state*."[7] (Italics added.)  Moreover, during the voir dire of the social worker, he elicited testimony acknowledging false memory syndrome was "not accepted in some places" and did not constitute a psychiatric or medical diagnosis.  Despite Mr. Calhoun's strong objections, the court found Mouanoutoua "qualified to testify as an expert under false memory syndrome, and that's based on [her] having greater knowledge than the trier of facts in this limited area."  On this record, we are not persuaded by Angelina's argument that if she had been appointed counsel, her attorney would likely have had greater success in obtaining a ruling to exclude Mouanoutoua's expert testimony on false memory syndrome.

---

**6**    We are mindful the juvenile court found that Mr. Calhoun could properly represent Autumn's interests after holding an inquiry into the matter.  However, we express some reservations here based on suggestions in the record that Mr. Calhoun arguably advocated on Angelina's behalf, or she at least viewed him as her advocate during the proceedings.  Thus, there were times, in encounters with the social worker and in court, when Angelina appeared to defer to Mr. Calhoun or seek his advice.  Also, in written objections to the social worker's opinions filed on June 13, 2012, Mr. Calhoun was specifically identified as "*Attorney for Angelina* [*I.*]" under his name and contact information.  (Italics added.)  This might very well have been an inadvertent typographical error.  Nevertheless, it raises the suggestion of a possible conflict of interest, an issue the juvenile court might consider revisiting in future proceedings.

**7**    Mr. Calhoun did, however, agree the social worker was an expert in child psychology and in child abuse and neglect based on her master's degree.

31.

Angelina's other arguments are equally unpersuasive. She contends an attorney would likely have limited the evidence introduced on her behalf, and gives the following example: "[A]n attorney may have limited the information in the declarations submitted so that the declarations referred only to the relevant issues raised in the petition" or "may have suggested that no declarations be submitted prior to the dispositional hearing." While she does not elaborate, presumably Angelina's argument is alluding to the fact her declarations often worked against her by providing further evidence of her troubling behavior. However, even had Angelina's declarations been limited or omitted, evidence of her continuing allegations of abuse (which expanded during the proceedings to include more and more members of Autumn's maternal family and became increasingly disturbing in content ) would still have been before the court through the agency's reports, which had copies of Angelina's accusatory letters and text messages attached. The same is true of Angelina's charges of bias and dishonesty against the agency, social workers, and others connected to the proceedings. Thus, Angelina has not shown the outcome would have been more favorable to her had she been represented by an attorney who effectively reined in her declarations.

Angelina also argues "an attorney would have been able to formulate questions that would have elicited answers that may have helped further Angelina's interests." In support of her argument, she points to her difficulty formulating questions during cross-examination of Mouanoutoua, and to occasions when she interrupted counsel or asked questions at inappropriate times. While we have little doubt an attorney would have more skillfully handled the examination of witnesses, this falls short of establishing a reasonable likelihood Angelina would have obtained a more favorable result had she been represented by counsel.

Angelina further argues she "was unable to discern when an objection might be appropriate or formulate meaningful objections." She asserts an attorney would likely have been able to overcome the hearsay objection and find means to introduce evidence

32.

she sought to introduce of Autumn's statements that she watched vulgar movies at Frank and Francine's house, possibly by calling Autumn as a witness. But Angelina does not explain how this evidence would likely have changed the outcome of the proceedings but merely speculates that "[w]hether or not Autumn watched violent or vulgar movies at Frank and Francine's home *may* have been relevant to the source of Autumn's statements regarding abusive behaviors by Fallon." (Italics added) In any event, it is unlikely such evidence would have made a difference in light of compelling evidence that *Angelina* was the source of Autumn's statements regarding the alleged abuse by Fallon, which Autumn indicated she did not remember until more than a week after Angelina described the abuse in her letter to Fallon.

Similarly, Angelina asserts an attorney would likely have been able to overcome the hearsay objection to her testimony that Chancey told her an Amber Alert was issued against her by arguing that it was not being offered to prove the truth of the matter asserted but to show Angelina believed an alert had issued. Again, Angelina fails to explain how this evidence would likely have made a difference to the outcome of the proceedings. However, we do not believe it would have made a difference since evidence that Chancey told Angelina there was an Amber Alert against her was already before the court through Lupe M.'s testimony. Moreover, this evidence was not directly relevant to the allegations in the dependency petition but appears to relate to a particular referral described in the agency's reports, reflecting an incident in October 2011 during which Angelina reportedly called the district attorney's office, angrily complaining that an Amber Alert had issued against her two days earlier and claiming that Autumn's "other grandparents" would file false police reports against her. When Angelina called again later and was informed no Amber Alert or criminal reports against her had been located, Angelina became very irate and "changed her story," stating the Amber Alert had been issued two months prior.

33.

Additionally, Angelina argues that an attorney would likely have found a way to introduce evidence "to prove the point Angelina was trying to make, which was that lack of evidence of sexual molest does not prove it did not happen" but "merely leaves open the question of whether or not the child was molested." In addition to its failure to demonstrate prejudice, Angelina's argument is unpersuasive because there is no indication in the record that anyone connected to this case believed Autumn had not been sexually abused based *solely* on the lack of physical evidence. When Angelina's original allegations of sexual abuse against Steve surfaced several years prior to the initiation of these proceedings, the police and agency did not reject the allegations based simply on the lack of physical evidence that Autumn was abused, but also on the existence of circumstances indicating Angelina was the one who manufactured the allegations. According to Officer Bidegaray's unrefuted testimony, when Autumn was interviewed at that time, she disclosed no sexual abuse by Steve.[8] And Angelina herself told the officer that Autumn never mentioned that Steve touched her inappropriately. Rather, Angelina said she suspected he did something inappropriate because Autumn allegedly smelled like "man sweat" after being at his home.

In light of the agency's rejection of Angelina's original sexual abuse allegations years earlier based on both the lack of evidence and circumstances indicating she made them up, it was not unreasonable for professionals involved in these proceedings to begin with the assumption that the allegations remained unfounded; Angelina's continued repetition of the allegations and the progressive addition of implausible details did not make them any less false.

---

[8] The jurisdiction/disposition report reflects that at the time, Autumn did make statements to the effect that she was scared of Steve because he choked her, demonstrating with her hands on her neck. However, the agency believed Autumn was coached in making these statements, noting Steve's right arm was amputated and he was therefore unable to choke the child with both hands.

## II.    *De Facto Parent Status*

Angelina challenges the order of the juvenile court on July 19, 2012, granting de facto parent status to the maternal grandfather and stepgrandmother, Frank and Francine, arguing that their relationship with Autumn did not rise to the level required for this status.  The agency responds that Angelina, as a guardian, does not have standing to challenge the order.  Angelina replies that she is aggrieved by the order because it allows Frank and Francine access to all court hearings, at which they will be exposed to confidential information regarding Angelina.

We agree that Angelina lacks standing to challenge the order granting de facto parent status to Frank and Francine because she is not aggrieved by that order.  (*In re Vanessa Z.* (1994) 23 Cal.App.4th 258*,* 261; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1836; *In re Crystal J.* (2001) 92 Cal.App.4th 186, 189.)

The concept of a de facto parent was judicially created to recognize limited rights in dependency cases for a person who has been found by the juvenile court to have assumed the role of a parent on a day-to-day basis, fulfilling the child's physical and psychological needs for affection and care for a substantial period of time.  (*In re B.G.* (1974) 11 Cal.3d 679, 692-693 & fn. 18; *In re Kieshia E.* (1993) 6 Cal.4th 68, 70-71; rule 5.502(10).)  The juvenile court does not consider whether granting de facto parent status would be detrimental to the child or in the child's best interests, but whether the adult has assumed the role of parent and possesses information that would be in the child's best interests for the court to receive*.* (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 383*,* fn. 5.)  The doctrine of de facto parenthood should be "liberally applied to ensure that all legitimate views, evidence, and interests are considered in dispositional proceedings involving a dependent minor."  (*In re Kieshia E., supra,* at p. 76.)  A de facto parent is entitled to be present at hearings with counsel and to introduce relevant evidence that may aid in the trial court's decision-making process with respect to the child's best interests.  (*In re Joshuia S.* (1988) 205 Cal.App.3d 119, 125.)

"De facto parents are not equated with biological parents or guardians for purposes of dependency proceedings and standing to participate does not give them all of the rights and preferences accorded such persons." (*In re Rachael C.* (1991) 235 Cal.App.3d 1445, 1452, disapproved on other grounds in *In re Kieshia E., supra,* 6 Cal.4th at p. 80.) A grant of de facto parent status gives a person the right to be present at the dependency hearing, to be represented by counsel, and to present evidence. (Rule 5.534(e); *In re Patricia L.* (1992) 9 Cal.App.4th 61, 66.) De facto parents may "appear as parties to assert and protect their own interest[s] in the companionship, care, custody and management of the child." (*In re B.G., supra,* 11 Cal.3d at p. 693, fn. omitted.)

De facto parent status does not give the de facto parent the right to have the minor placed with him or her, nor does it entitle the de facto parent a right to reunification services. (*In re Kieshia E., supra,* 6 Cal.4th at p. 77, fn. 7; *In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1490-1491, & fn. 11; *Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 752.) A de facto parent's connection with the proceedings is that person's separate interest and relationship with the child, which may have developed over time through the daily care, affection, and concern for the child. (*In re Vanessa Z.*, *supra*, 23 Cal.App.4th at p. 261.) However, "[d]e facto parents are not part of any adversarial aspect of a dependency case." (*In re B.F.* (2010) 190 Cal.App.4th 811, 817, fn. omitted.)

In *In re Vanessa Z.,* the court held that a father lacked standing to challenge the denial of his mother's motion to be declared the child's de facto parent because his interests were not affected by the denial of the motion. (*In re Vanessa Z., supra,* 23 Cal.App.4th at p. 261.) The court explained that a parent's interest in a dependency proceeding is to reunify with the child, while a de facto parent's interest is that person's separate interest in his or her relationship with the child. The fact that the motion was denied did not preclude the father from presenting any evidence relating to the child's best interest or his relationship with the child. (*Ibid.*) This reasoning was followed by *In re Daniel D.*, in which the court held a parent had no standing to challenge another

party's de facto parent motion.  (*In re Daniel D., supra,* 24 Cal.App.4th at pp. 1835-1836.)

Angelina's interest in the dependency proceedings was to reunify with Autumn and that interest was not affected by an order granting Frank and Francine de facto parent status.  Angelina was not precluded from presenting evidence relating to Autumn's best interests or her relationship with her.  (*In re Vanessa Z., supra,* 23 Cal.App.4th at p. 261; *In re Crystal J., supra,* 92 Cal.App.4th at p. 190.)  Thus, Angelina's interests were not prejudiced when the court conferred de facto parent status on the maternal grandparents. (*In re Daniel D., supra,* 24 Cal.App.4th at p. 1835.)  Angelina lacks standing to challenge the granting of de facto parent status to Frank and Francine.

## III.    *De Facto Parents' Access to Records*

Angelina challenges the juvenile court's granting Frank and Francine's access to confidential records.  This contention has merit.

As we have explained, "[w]hile de facto parents have 'standing to participate as parties' (rule 5.534(e)), their role is limited and they do not enjoy the same due process rights as parents.  (*In re Kieshia E., supra,* [6 Cal.4th] at p. 77, citing *In re B.G.*[, *supra,*] 11 Cal.3d [at p. ]693, fn. 21; *Clifford S. v. Superior Court*[, *supra,*] 38 Cal.App.4th [at p. ]755; compare rule 5.534(e) [de facto parents may be present at the hearing, be represented by counsel and present evidence] with rule 5.534(k)(1)(B) [parents and children have the right to confront and cross-examine the social worker and other witnesses].)  De facto parents do not have an automatic right to receive the Agency's reports and other documents filed with the court.  (Cf. rule 5.534(k)(2)(A), (3) [parents and children have the right to receive Agency's reports and, '[u]nless prohibited by court order, … the right to receive all documents filed with the court']; rule 5.546(d)(6) [Agency's duty to disclose material and information, 'including results of … mental examinations,' to parents and children].)"  (*In re B.F.*, *supra*, 190 Cal.App.4th at p. 817.)

"'It is the express intent of the Legislature "that juvenile court records, in general, should be confidential."'" (*In re Keisha T.* (1995) 38 Cal.App.4th 220, 231, quoting § 827, subd. (b)(1).) Thus, section 827 restricts access to the case file in a juvenile proceeding. That section lists persons entitled to inspect the file without a court order, and a smaller number of persons who are also entitled to receive copies of the file without a court order. (§ 827, subd. (a)(1), (5); rule 5.552(b)(1).) De facto parents are not listed (§ 827, subd. (a)(1)), but they have standing to petition the juvenile court for the right to inspect or copy the case file (§ 827, subd. (a)(1)(P); rule 5.552(b)(3), (c))." (*In re B.F., supra,* 190 Cal.App.4th at p. 818.)

De facto parents must adhere to the following procedure to seek access to confidential records: "A section 827 petition must identify '[t]he specific records sought' and 'describe in detail the reasons the records are being sought and their relevancy to the proceeding or purpose for which petitioner wishes to inspect or obtain the records.' (Rule 5.552(c).) To prevail, the petitioner must show good cause. (Rules 5.552(e)(1) [if the petition does not show good cause, the court may deny it summarily], (2) [if petitioner shows good cause, the court may set a hearing].) The petitioner has the burden of proving, by a preponderance of the evidence, 'that the records requested are necessary and have substantial relevance to the legitimate need of the petitioner.' (Rule 5.552(e)(6).)" (*In re B.F., supra,* 190 Cal.App.4th at p. 818.)

"All interested parties must be given notice and an opportunity to object to the section 827 petition. (§ 827, subd. (a)(3)(B).) '[I]f the court determines that there may be information or documents in the records sought to which the petitioner may be entitled, the … court … must conduct an in camera review of the juvenile case file and any objections and assume that all legal claims of privilege are asserted.' (Rule 5.552(e)(3).) 'In determining whether to authorize inspection or release of juvenile case files, in whole or in part, the court must balance the interests of the child and other parties to the juvenile court proceedings, the interests of the petitioner, and the interests

of the public.'  (Rule 5.552(e)(4).)  To grant the petition, the court must determine 'that the need for discovery outweighs the policy considerations favoring confidentiality of juvenile case files.'  (Rule 5.552(e)(5).)  'The court may permit disclosure of juvenile case files only insofar as is necessary .…'  (Rule 5.552(e)(6).)"  (*In re B.F., supra,* 190 Cal.App.4th at p. 818.)

Here, the juvenile court erred by granting Frank and Francine wholesale access to all records rather than utilizing the preceding procedure.  The court's order permitting such access must be reversed.

## IV. *False Memory Syndrome*

Angelina contends the juvenile court abused its discretion in admitting testimony regarding false memory syndrome because Mouanoutoua did not qualify as an expert on the subject and because the testimony was inadmissible under the evidentiary standards set forth in *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*) and *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), also known as the *Kelly-Frye* test.  We conclude the court did not abuse its discretion in finding the social worker qualified as an expert on the subject of false memory syndrome.  However, even assuming the court erred in admitting the testimony, we find the error was harmless.

### A. *Expert Qualification*

In challenging the social worker's testimony, Angelina first contends Mouanoutoua did not qualify as an expert on false memory syndrome under Evidence Code section 720 because "she had scant training in false memory syndrome" and "she merely learned about false memory syndrome as part of general education courses in the field of social work."  We disagree with Angelina's characterization of the record.  The social worker's testimony during voir dire indicated she learned about false memory syndrome not in general education courses but in specialized courses on child abuse.  For this and other reasons discussed in more detail below, we conclude the court did not

39.

abuse its discretion in permitting the social worker to testify as an expert on false memory syndrome.

Evidence Code sections 720 and 801 are the California provisions governing admissibility of expert testimony. Evidence Code section 720, subdivision (a), provides: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates...." Subdivision (b) of that section provides: "A witness'[s] special knowledge ... may be shown by any otherwise admissible evidence, including his own testimony."

Evidence Code Section 801 permits an expert to state an opinion that is "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge ...) perceived by or personally known to the witness ..., whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"A trial court has discretion to determine whether a proposed witness is qualified to testify as an expert under [Evidence Code section 720], and this determination will not be disturbed absent an abuse of discretion. [Citation.]" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1421.) Such abuse of discretion will be found only where ""'the evidence shows that a witness *clearly lacks* qualification as an expert ....'"" [Citation.]" (*People v. Chavez* (1985) 39 Cal.3d 823, 828.) "[A]n expert's qualifications 'must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient. [Citations.]' [Citation.]" (*Ibid.*)

Here, the voir dire of social worker Mouanoutoua revealed that in May 2011 she received a master's degree in social work and, at the time of the jurisdictional hearing, had worked as a social worker for the agency for approximately one year. Prior to that,

40.

she interned for a year as a mental health therapist at an agency called Comprehensive Youth Services. During her term, she provided one-on-one therapy to adults and children. She also interned as a social worker in the agency's family reunification unit from August 2009 to May 2010. Mouanoutoua testified that, in her training, she had "completed over 26 courses in relation to this case," including courses on emotional, physical, and sexual child abuse, and false memory syndrome was specifically discussed in her training and coursework. She also testified she had firsthand experience counseling children dealing with false memory syndrome. In light of Mouanoutoua's education, training, and experience relating to false memory syndrome, we cannot say the evidence showed the social worker *clearly* lacked qualification as an expert. Therefore, it was not an abuse of discretion to permit her to testify as an expert on the subject.

### B. Kelly-Frye

Next, Angelina contends Mouanoutoua's expert testimony on false memory syndrome was inadmissible under the *Kelly-Frye* test because, as the social worker herself attested, the syndrome is controversial and has not been widely accepted in the psychological community. As we shall explain, although this case is arguably distinguishable from the authority on which Angelina relies to support her contention, we need not resolve the question of whether evidence of false memory syndrome should have been excluded under the *Kelly-Frye* test because Angelina cannot establish prejudice.

The *Kelly-Frye* test applies to the admissibility of expert testimony based on "a new scientific technique." (*Kelly*, *supra*, 17 Cal.3d at p. 30.) The test involves a two-step process: "(1) The reliability of the method must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject." (*Ibid.*, italics omitted.)

In support of her argument that the juvenile court erred in admitting expert testimony regarding false memory syndrome, Angelina relies heavily on *In re Sara M.*

41.

(1987) 194 Cal.App.3d 585 (*Sara M.*). In *Sara M.*, the court held that under the *Kelly-Frye* test, expert testimony regarding "child molest syndrome" was not admissible to prove that a child was molested. (*Sara M.*, *supra*, at pp. 592, 594; see also *People v. Bledsoe* (1984) 36 Cal.3d 236, 251 (*Bledsoe*) [under *Kelly-Frye* test, expert testimony regarding "rape trauma syndrome" inadmissible to prove complaining witness was raped].) The *Sara M.* court explained:

> "A basic defect of the [child molest] syndrome is thus apparent: the syndrome was developed on the assumption the children studied were in fact molested. Moreover … it appears to be a tool for therapy and treatment, much like the rape trauma syndrome. Consequently, the same problem discussed in *Bledsoe* may be present in the case of the child molest syndrome: if it was not developed as a truth-seeking procedure but rather as a therapeutic aid, it cannot be used for a different purpose, i.e., to prove a molestation occurred." (*Sara M.*, *supra*, at p. 593, fn. omitted.)

The agency, on the other hand, suggests the social worker's testimony regarding false memory syndrome was not subject to the *Kelly-Frye* test, relying on *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*). In *Stoll*, a defendant accused of child molestation proffered expert testimony by a psychologist, who conducted tests of the defendant and concluded she did not possess any pathology in the nature of sexual deviation. (*Id.* at p. 1146.) The trial court excluded the expert opinion on the grounds that it did not pass the *Kelly-Frye* test. (*Stoll*, *supra*, at p. 1147, 1150-1151.) Our Supreme Court, however, held "[t]he psychological testimony proffered here raises none of the concerns addressed by *Kelly-Frye*. The methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility." (*Id.* at p. 1157.)

The Supreme Court noted that in determining whether expert testimony is based on a new scientific technique requiring scrutiny under the *Kelly-Frye* test, the court must consider the test's "narrow 'common sense' purpose, i.e., to protect the jury from techniques which, through 'new,' novel, or '"experimental,"' convey a '"misleading aura of certainty."' [Citations.]" (*Stoll*, *supra*, 49 Cal.3d at pp. 1155-1156.) Absent "some

42.

special feature which effectively blindsides the jury," a psychologist's expert opinion testimony is not subject to the *Kelly-Frye* test. (*Stoll*, *supra*, at p. 1157.) This is because "'[w]hen a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible….'" (*Ibid.*)

The agency suggests that social worker Mouanoutoua's assessment of Autumn was more akin to the psychologist's assessment of the defendant in *Stoll*, and the *Kelly-Frye* test was inapplicable because "[n]othing in her testimony carried a misleading aura of scientific infallibility." The agency further suggests false memory syndrome evidence would pass the *Kelly*-Frye test in any event, asserting "the intellectual jury ha[s] tipped the scales in favor of the false memory syndrome side of the debate" and citing a law review article about studies on children's susceptibility to forms of suggestion.

*Sara M.*, on which Angelina relies, is arguably distinguishable from this case. Angelina asserts: "Here, like in *Sara M.*, the testimony was offered in support of the case-in-chief to show that Autumn had not been molested and Angelina implanted memories into her." However, contrary to Angelina's suggestion, the agency did not rely on evidence Autumn was suffering from false memory syndrome in order to prove she had not in fact been molested by her maternal stepgrandfather, Steve. Rather, the agency and police department had *already* investigated and found Angelina's allegations of sexual abuse to be unfounded several years earlier and the agency's investigation in the current proceedings focused on assessing how Angelina's continued repetition of these baseless allegations was affecting Autumn. As discussed above, it appears the social worker and others connected to the investigation were reasonably operating on the assumption that Angelina's allegations were false based on the agency's previous findings. Thus, the primary purpose of the false memory syndrome evidence was not to prove Autumn was not actually a victim of sexual abuse, something the agency had

already established, but to show how Angelina's persistent delusions of victimization were emotionally harming Autumn.

### C. Harmless Error

The juvenile court may exercise dependency jurisdiction over a child who is suffering serious emotional damage, or who is at substantial risk of suffering serious emotional damage, as evidenced by severe anxiety, depression, withdrawal, or untoward aggression, resulting from the conduct of the child's parent or guardian. (§ 300, subd. (c).) In other words, the agency was required to prove three elements for the court to assert jurisdiction in this case: "(1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

The juvenile court may also order a child removed from the custody of the child's parent or guardian if the court finds by clear and convincing evidence the child is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggression and there are no reasonable means by which the child's emotional health may be protected without removal. (§ 361, subd. (c)(3).)

Section 361 provides in pertinent part: "(c) A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence .… [¶] … [¶] (3) The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others .…."

Angelina specifically contends that without the evidence of false memory syndrome, substantial evidence would not likely have supported the juvenile court's jurisdictional and dispositional findings because there was no substantial evidence her conduct had caused Autumn to suffer or placed her at a substantial risk of suffering

serious or severe emotional harm as evidenced by severe or extreme anxiety, depression, withdrawal or untoward aggressive behavior. We disagree.

Initially, we reject Angelina's assertion that, like the testimony concerning child molest syndrome in *Sara M.*, *supra*, 194 Cal.App.3d at page 594, the testimony concerning false memory syndrome here "permeated" the jurisdictional and dispositional hearings. As previously discussed, contrary to Angelina's suggestion, the agency did not depend on Mouanoutoua's opinion that Autumn suffered from false memory syndrome to prove Angelina's allegations of sexual abuse were false. That conclusion had already been long established prior to Mouanoutoua's involvement and finds ample evidentiary support in the record. While it is true Mouanoutoua's opinion that Autumn was suffering false memory syndrome factored heavily in her opinion that Angelina's behavior had harmed Autumn emotionally, the agency presented other substantial evidence of emotional harm at the jurisdictional hearing, including evidence of withdrawal in that Autumn was becoming socially isolated and was manifesting signs of severe anxiety through both day and nighttime wetting accidents that were still occurring at the time of the jurisdictional hearing. Notably, in closing argument, county counsel did not specifically mention false memory syndrome but cited to the evidence of enuresis and emotional volatility exhibited by Autumn in her reported interactions with the social worker, both of which support the conclusion that Autumn was suffering or was at substantial risk of suffering serious emotional harm.

Although the case is not mentioned in the parties' briefing on appeal,[9] the record shows that the agency relied on *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1314 (*Matthew S.*) at the jurisdictional hearing to support its argument that Angelina's conduct placed Autumn at risk of suffering serious emotional harm. In *Matthew S.*, a mother had delusions that her 13-year-old son's penis had been mutilated and she had murdered the

---

[9] The agency did, however, raise *Matthew S.* at oral argument.

45.

treating physician.  Acting on those delusions, the mother took her son to a urologist, who found no evidence of injury.  (*Ibid.*)  The mother had other delusions about her son's penis being mutilated and about being married to an actor who she claimed had been murdered by the Mafia.  (*Ibid.*)  The Court of Appeal affirmed juvenile court jurisdiction, concluding substantial evidence supported jurisdictional findings under section 300, subdivision (c) that the son was at substantial risk of suffering serious emotional damage.  (*Matthew S.*, *supra*, at pp. 1320-1321.)  The court explained that although the son had not yet suffered emotional harm, substantial evidence "point[ed] to a substantial risk of emotional harm."  (*Id.* at p. 1320.)  "[The mother] brings a foreboding sense of dread, danger and catastrophe to the lives of her children.  Although [the son] so far has been able to deal with his mother's delusions, he is confused by them … [and] is forced to shoulder a tremendous burden."  (*Ibid.*)

Here, the evidence establishing Autumn's risk of suffering serious emotional harm was at least as great as that of the minor in *Matthew S.*  Whether or not Autumn suffered from false memory syndrome, she clearly shouldered a tremendous burden in dealing with Angelina.  In Autumn's presence, Angelina would openly describe the young child to others as a victim and perpetrator of familial sexual abuse, and claim she suffered from chronic, nonexistent medical conditions limiting her ability to engage in normal childhood activities.  And, in contrast with *Matthew S.*, there was evidence here that Autumn had already begun to suffer emotional damage as a result of Angelina's conduct.

Angelina's reliance on in *In re Brison C.* (2000) 81 Cal.App.4th 1373 (*Brison C.*) is misplaced.  In *Brison C.*, the minor was a pawn in an ongoing and vicious custody battle between the parents.  This court concluded:  "The evidence shows only that [the minor], an otherwise reasonably well-adjusted child who performed well at school and displayed no serious behavioral problems, despised his father and desperately sought to avoid visiting him.  Standing alone, this circumstance is insufficient to support a finding that [the minor] is seriously emotionally damaged."  (*Brison C.*, *supra*, at p. 1376.)

Furthermore, the evidence did not support a finding the minor was at substantial risk of suffering serious emotional damage because as of the time of the jurisdictional hearing, "the parents had recognized the inappropriateness of their behavior and made good faith efforts to alleviate the problem." (*Ibid.*)

On the issue of substantial risk of serious emotional harm, *Brison C.* is considerably different from this case because there, both parents had recognized the inappropriateness of their past behavior and had expressed a willingness to change their behavior and attend therapy. (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1381.) There was no evidence the parents suffered from mental illness, were delusional, or were incapable of "expressing their frustration with each other in an appropriate manner." (*Ibid.*)

In contrast here, Angelina has never recognized the inappropriateness of her behavior, has never expressed a willingness to change, and appears incapable of acting in an appropriate manner as evidenced by her continuing and increasingly bizarre allegations of abuse during the proceedings. Even without reference to evidence of false memory syndrome, there is substantial evidence Angelina's relentless exposure of Autumn to such allegations has caused Autumn to suffer emotional harm and placed her at substantial risk of further, serious emotional harm.

For the same reasons, even without the evidence of false memory syndrome, there was substantial evidence supporting the court's removal order at the conclusion of the dispositional hearing. In addition to the evidence of enuresis and emotional volatility relied on at the jurisdictional hearing, the agency presented additional evidence that Autumn was exhibiting signs of extreme anxiety, emotional withdrawal, and aggression towards others in that she had regressed to chronic thumb sucking, she was engaging in pathological behaviors including lying and stealing money from relatives, and she became mute and withdrawn in a therapy session when Angelina became upset and insisted that she make disclosures of sexual abuse. There was also evidence that despite her self-reports of feeling good and happy and her good behavior and grades at school,

Autumn was manifesting physical symptoms of emotional distress, including chronic headaches and stomachaches, resulting in numerous school absences and, consequently, lost opportunities to socialize with peers. Moreover, as at the jurisdictional hearing, county counsel did not specifically mention the evidence of false memory syndrome in closing argument at the dispositional hearing. On the record before us, we are unable to conclude there is a reasonable probability Angelina would have obtained a more favorable result at either the jurisdictional or dispositional hearing if Mouanoutoua's expert testimony regarding false memory syndrome had been excluded.

## *DISPOSITION*

The juvenile court's order granting the de facto parents access to confidential records is reversed. In all other respects, affirm the jurisdictional and dispositional orders of the juvenile court.

_____

Kane, J.

WE CONCUR:


_____

Wiseman, Acting P.J.


_____

Levy, J.

48.